# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.

_____

| | |
|---|---|
| BRIDGE OVER TROUBLED WATERS, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )                     **COMPLAINT** |
| | ) |
| ARGO TEA, INC. | ) |
| | ) |
| Defendant. | ) |
| | ) |
_____)

## PRELIMINARY STATEMENT

Defendant Argo Tea, Inc. ("Argo" or "Argo Tea"), a high-end tea retailer with multiple locations throughout the United States and the Middle East, abandoned its intention to expand its offerings to Boston Common.  It then decided to leave its landlord, Bridge Over Troubled Waters ("Bridge"), a non-profit organization serving runaway, homeless and high-risk youth, holding the bag.  Argo Tea has breached its unambiguous contractual obligations to Bridge and has caused Bridge more than $1.5 million in actual damages.  Argo Tea has also engaged in unfair and deceptive trade practices in an effort to deprive Bridge (and the at-risk youth that it serves) of the benefit of a bargain of vital importance to Bridge's essential mission.  Argo Tea's unlawful conduct is steeped in misrepresentation and deceit and was both knowing and willful. A multiple damage award against Argo Tea is fully warranted.

## PARTIES AND JURISDICTION

1.      The Plaintiff, Bridge Over Troubled Waters, Inc., is a nonprofit corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business at 47 West Street, Boston, MA 02111, near Boston Common.

2.      The Defendant, Argo Tea, Inc., is a foreign corporation organized under the laws of Delaware with a principal place of business at 16 West Randolph St., Chicago IL 60601.

3.      Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction over this action.   The amount in controversy exceeds $75,000 and the controversy is between a Massachusetts nonprofit corporation with a principal place of business in Massachusetts and a Delaware corporation with a principal place of business in Illinois.

4.      Argo Tea is subject to personal jurisdiction in this District.  It is registered to do and transacts business in the Commonwealth.  Argo also has other substantial contacts within the Commonwealth.  Moreover, Bridge's claims arise out of and are substantially related to Argo Tea's contacts within the Commonwealth and in this District.  Specifically, Argo has breached a lease with Bridge, relative to the possession and use of real property located within this District.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims asserted in this complaint occurred in this District.

## FACTS

### A.  Bridge and Argo Enter Into the Lease

6.      Bridge is a nonprofit organization dedicated to transforming the lives of runaway, homeless and high-risk youth through safe, supportive, and encouraging relationships and effective and innovative services that guide them toward self-sufficiency.

7.      Bridge owns a building at 47 West Street, Boston.  Bridge uses the building for the provision of its services to homeless, runaway and at-risk youth, including the operation of a residential program.  The building also serves as headquarters for the charitable organization.

8.      In order to help fund its charitable mission, Bridge leases out a portion of the ground floor of its building facing the Boston Common along Tremont Street (the "Premises"). Because of the use of other portions of the building for Bridge's residential program and related services, Bridge is selective with respect to the type of tenant to whom it will lease and the type of use it will allow at the Premises.  When proposing to Bridge its plans to open a retail tea shop and café in the Premises, Argo Tea represented itself as a reputable tenant to operate a compatible use at the Premises.

9.      On January 8, 2015, the Parties entered into the Lease for the Premises with Argo Tea for the operation of a retail tea shop and cafe.  A true and accurate copy of the Lease is attached hereto as Exhibit A.

10.     The Lease was intended by Bridge to provide it with income to help defray the costs of its extensive array of services to homeless, runaway and at-risk youth.  That income is vital to Bridge's mission.

11.     Article 4.5(c) of the Lease sets forth Argo's obligations to, among other things: obtain permits to build-out the Premises, use reasonable efforts in obtaining its permits, keep Bridge informed of its progress, and obtain the permits by a date certain.  Article 4.5(c) provides as follows:

> (c)      Promptly following Landlord's approval of Tenant's plans and specifications as set forth above, Tenant, at its sole cost and expense, ***shall apply for, and thereafter use reasonable efforts to obtain, all necessary governmental permits and approvals for Tenant's Work and all other governmental permits and approvals as shall be necessary in order for Tenant to promptly open and operate the Premises for the Permitted Use as required herein (collectively, "Tenant's Permits")***.  No plans and/or specifications shall

be filed or submitted to any governmental authority in connection with Tenant's Permits without Tenant's first having obtained Landlord's approval of same.  Landlord agrees to cooperate with and provide reasonable assistance to Tenant in connection with Tenant's pursuit of expense in connection therewith.  ***Tenant shall keep Landlord reasonably apprised of the progress of Tenant's Permits, including without limitation Tenant's promptly providing Landlord with copies of all applications, submissions and correspondence given or received in connection with Tennant's Permits.***  The date upon which Tenant's Permits shall have been issued is referred to herein as the "Permits Date."  ***If the Permits Date has not occurred by the Outside Permits Date then either party shall have the right to terminate this Lease without further recourse by notice to the other party, except that Tenant shall not have the right to so terminate this Lease if Tenant is in default of any of its obligations hereunder (including without limitation any failure by Tenant to have exercised reasonable efforts to obtain Tenant's Permits as required herein).***  As used herein, the "Outside Permits Date" shall mean 120 days after the Date of Lease as the same may be extended as set forth below.  ***If Tenant is unable to obtain Tenant's Permits by the Outside Permits Date as originally set forth herein then Tenant may, by notice to Landlord given before such Outside Permits Date, request that Landlord consent to a one-time 30-day extension of the Outside Permits Date.  So long as Tenant shall have theretofore been using continuous reasonable efforts to obtain Tenant's Permits, Landlord shall not unreasonably withhold, condition or delay such consent.***  (emphasis added)

12.     In accordance with other provisions of the Lease, once Bridge tendered possession of the Premises to Argo Tea, Argo was required to "accept possession and enter into good faith occupancy of the entire Premises to perform Tenant's Work and thereafter operate its business therein."  Article 4.3.

13.     In addition, Article 7.5 of the Lease required Argo Tea to maintain insurance for the Premises and provide Bridge with proof thereof.

### B.  Argo Breaches Article 4.5 of the Lease

14.     Argo Tea did not, however, use reasonable efforts to obtain Tenant's Permits and did not keep Bridge apprised of its progress (or lack thereof) in obtaining Tenant's Permits.

15.     In fact, after it signed the Lease, Argo Tea made no further effort to secure the permits necessary to its use and occupation of the Premises.

16.     Following execution of the Lease, the City of Boston Inspectional Services Department ("ISD"), the Boston Redevelopment Authority ("BRA"), and the City of Boston Health Department (collectively, the "Permitting Authorities") each required additional information from Argo Tea that Argo failed or otherwise refused to provide.

17.     For example, on January 13, 2015, ISD requested that Argo Tea provide it with, among other things: "[t]wo complete sets of construction documents to scale, including all architectural, mechanical, electrical, structural and Fire Protection work, sealed by a registered Professional Engineer and/or Architect; Health Department approval; BRA design review . . . , [and] Licensed Builder information and signature."

18.     ISD expressly informed Argo Tea that this information was "required before permit can be issued."

19.     Notwithstanding ISD's request for additional required information, following execution of the Lease, Argo Tea made no further filings with ISD in pursuit of Tenant's Permits as required under the Lease.

20.     Argo also failed to keep Bridge apprised of its progress (or lack thereof) in obtaining the Tenant's Permits.  In fact, after the Lease was executed, Argo never provided Bridge with copies of its communications, if any, with the Permitting Authorities.

21.     In addition, Argo Tea made no effort to seek the 30-day extension of the Outside Permits Date that was provided for in the Lease.  See Article 4.5(c).

22.     Instead, Argo Tea abandoned its plans to operate at the Premises without telling Bridge.

**C. Argo Unlawfully Attempts to Terminate the Lease and Refuses to Cure its Breaches**

23.     Instead of using reasonable efforts to obtain Tenant's Permits, Argo decided to abandon its plan to open a location along Boston Common.

24.     This decision was contemporaneous with the commercial failure of Argo's flagship Massachusetts location in the Natick Mall.

25.     Rather than discuss with Bridge its change of plans in Massachusetts so as to minimize harm to Bridge and its mission, Argo Tea attempted to unilaterally terminate the Lease when it had no right to do so.

26.     Under the Lease, the Outside Permits Date upon which Argo Tea was to have secured the permits necessary for its operation was May 8, 2015.

27.     Had Argo Tea engaged in "continuous reasonable efforts to obtain Tenant's Permits," Argo Tea could have sought Bridge's consent to a one-time 30-day extension of the Outside Permits Date to June 7, 2015.  See Lease, 4.5(c)

28.     Argo Tea did not make any effort to seek to extend the Outside Permits Date to June 7, 2015 (or to any other date).

29.     Rather, on June 10, 2015, Argo Tea, through counsel, attempted to unilaterally terminate the Lease.

30.     However, Argo Tea had no right to terminate at that time.  First, the termination effort was untimely because it was 32 days after the May 8, 2015 Outside Permits Date. Moreover, pursuant to the express terms of the Lease, Argo Tea had no right to terminate unless it had first made reasonable efforts to obtain Tenant's Permits.  See Lease, 4.5(c) ("If the Permits Date has not occurred by the Outside Permits Date then either party shall have the right to terminate this Lease without further recourse by notice to the other party, *except that Tenant*

*shall not have the right to so terminate this Lease if Tenant is in default of any of its obligations hereunder (including without limitation any failure by Tenant to have exercised reasonable efforts to obtain Tenant's Permits as required herein)*") (emphasis added).

31.     Despite the fact it had no right to terminate, Argo Tea refused to perform its obligations under the Lease and has since wrongfully demanded the return of its security deposit.

32.     On June 16, 2015, in accordance with its obligations under the Lease, Bridge provided Argo Tea with notice that Argo had 30 days in which to cure its breaches of the Lease.

33.     On June 30, 2015, again in accordance with its obligations under the Lease, Bridge tendered possession of the Premises to Argo Tea.

34.     Argo made no attempt to cure its breaches during the cure period and, in fact, has committed multiple other violations of the Lease:  in violation of Article 4.3 of the Lease, Argo failed to occupy the Premises; and, in violation of Article 7.5 of the Lease, Argo failed to maintain insurance on the Premises and provide Bridge with a certificate of insurance.

35.     With Argo Tea unwilling to satisfy its obligations under the Lease (while deceptively claiming to have terminated the Lease), on July 20, 2015, Bridge terminated the Lease and, pursuant to Article 8.2, accelerated the collection of Base Rent as well as additional rent due for real estate taxes.

36.     Bridge also informed Argo Tea that if it did not surrender the Premises immediately, it would be a tenant at sufferance and would thus owe additional amounts based on a daily rate of 150% of the Base Rent otherwise applicable.

37.     Argo Tea has failed to pay any accelerated Base Rent or additional rent for real estate taxes or any daily Base Rent at 150% of the rental rate otherwise in effect and has failed to return the keys to the Premises to Bridge.

38.     Instead, Argo, through counsel, continues to falsely claim that it terminated the Lease and demands repayment of its security deposit.

39.     Argo Tea has unlawfully refused to perform its unambiguous obligations under the Lease in order to coerce Bridge into conceding the rights and benefits provided to it under the Lease.

## COUNT I
## BREACH OF CONTRACT

40.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations of this Complaint as if they were set forth fully herein.

41.     The parties entered into the Lease with the intent to be bound.

42.     Bridge has fully performed each of its obligations under the Lease.

43.     The Lease is clear and definite in all of its material terms, supported by consideration, and constitutes a valid and binding contract that is fully enforceable by Bridge.

44.     Argo breached the Lease by, among other things:  (1) failing to use reasonable efforts to obtain all necessary governmental permits and approvals for its work and all other governmental permits and approvals as were necessary in order for Bridge to promptly open and operate the Premises; (2) failing to keep Bridge reasonably apprised of the progress of getting its permits, including failing to promptly provide Bridge with copies of all applications, submissions and correspondence given or received in connection with the permits; (3) failing to "accept possession and enter into good faith occupancy of the entire Premises in order to perform Tenant's Work and thereafter operate its business therein"; and (4) failing to maintain the required insurance.

45.     Bridge exercised its right under Article 8.2(i) to terminate the Lease and demand possession of the Premises because Argo did not cure its breaches within 30-days of receiving notice.

46.     Pursuant to Article 8.2(ii) of the Lease, Bridge is entitled to accelerate the payment of Base Rent and all additional rent under the Lease for the remainder of the Term, the amount of which will be determined at trial.

47.     Furthermore, Bridge is entitled to a daily rate of 150% of the Base Rent for every day that Argo was in possession of the Premises after the Lease was terminated.

48.     In addition, pursuant to Articles 7.4 and 10.13 of the Lease, Argo is required to indemnify Bridge and pay Bridge's reasonable attorneys' fees and court costs as a result Argo's defaults.

## COUNT II
## UNFAIR AND DECEPTIVE TRADE PRACTICES

49.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations of this Complaint as if they were set forth fully herein.

50.     Argo Tea is engaged in a trade or business in Massachusetts for the purposes of G.L. c. 93A.

51.     Following execution of the Lease, Argo knowingly and willfully represented to Bridge that it was seeking Tenant's Permits under the Lease, when, in fact, no such efforts were being made.

52.     Argo Tea has also willfully and knowingly misrepresented to Bridge that it was entitled to terminate the Lease and to the return of its security deposit with the intention that Bridge rely on those knowing misrepresentations.

53.     In addition, Argo Tea has unlawfully refused to perform its unambiguous obligations under the Lease in order to coerce Bridge into conceding the rights and benefits provided to it under the Lease.

54.     Argo Tea knows or has reason to know that the rental income it was to derive from the Lease is important to its charitable mission.

55.     Bridge has suffered actual damages as a result of Argo's knowing and willful commission of unfair and deceptive trade practices.

56.     Argo Teas is therefore liable to Bridge for multiple damages and attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, respectfully requests that this Court enter the following relief:

a.     Judgment in his favor on all counts;

b.     As to all counts, award damages in an amount to be proven at trial;

c.     As to Count II award treble damages, costs and reasonable
        attorneys' fees in accordance with the Lease and G.L. c. 93A, § 11; and

d.     Any and all other relief that is just and reasonable.

Respectfully submitted,

**BRIDGE OVER TROUBLED WATERS, INC.**

By its attorneys,

**BROWN RUDNICK LLP**

/s/ Wayne F. Dennison
Wayne F. Dennison (BBO# 558879)
Thomas J. Phillips (BBO# 550495)
Gregory Sampson (BBO# 664510)
Patrick G.H. Mott (BBO# 681868)
One Financial Center
Boston, MA  02111

Telephone: (617) 856-8200
Facsimile: (617) 856-8201
wdennison@brownrudnick.com
tphillips@brownrudnick.com
gsampson@brownrudnick.com
pmott@brownrudnick.com

Dated: October 21, 2015