UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
BRIDGE OVER TROUBLED WATERS, INC., )
                                )
            Plaintiff,          )
                                )
      v.                        )          CIVIL ACTION
                                )          NO. 15-13610-WGY
ARGO TEA, INC.,                 )
                                )
            Defendant.          )
_____)

YOUNG, D.J.                                December 14, 2016

### MEMORANDUM & ORDER

## I.   INTRODUCTION

This action involves the alleged breach of a commercial lease agreement (the "Lease").  The plaintiff and building owner Bridge Over Troubled Water, Inc. ("Bridge") entered into the Lease with the defendant Argo Tea, Inc. ("Argo"), pursuant to which Argo would rent a portion of Bridge's premises to operate a tea shop.

Bridge sued claiming that Argo failed to perform its obligations under the Lease and that Argo engaged in unfair and deceptive practices in violation of Massachusetts General Laws, chapter 93A, and seeking to recover rent under the Lease's liquidated damages clause (an "accelerated rent" provision).  Argo filed an answer in which it argued, as an affirmative

defense, that Bridge failed to mitigate its damages. It also brought counterclaims seeking declaratory relief that the Lease's rent acceleration clause is unenforceable, claiming that Bridge itself violated chapter 93A, and asking the Court to impose a constructive trust for Argo's benefit upon any net revenue received by Bridge as a result of releasing the premises in order to prevent Bridge from "double-dipping."

Bridge now moves for summary judgment on both its counts for breach of contract and for violations of chapter 93A as well as on Argo's counterclaim for violations of chapter 93A. Argo, in turn, moves for summary judgment as to both of Bridge's counts for breach of contract and for violations of chapter 93A.

**A. Procedural History**

Bridge initiated this action for breach of contract and for violations of Massachusetts General Laws, chapter 93A ("chapter 93A") on October 21, 2015. Compl., ECF No. 1. Argo timely filed an answer which contained fifteen affirmative defenses and counterclaims for declaratory relief regarding the enforceability of the acceleration clause, violations of chapter 93A, and a constructive trust. Answer and Countercls. ("Answer"), ECF No. 9.

On December 10, 2015, Bridge moved to dismiss each of Argo's three counterclaims and to strike its tenth affirmative defense (failure to mitigate). Pl.'s Mot. Dismiss Def.'s

Countercls. and Strike Affirmative Defense, ECF No. 13; Mem.
Supp. Pl.'s Mot. Dismiss Def.'s Countercls. and Strike
Affirmative Defense, ECF No. 14.  Argo opposed Bridge's motion
to dismiss.  Argo Tea's Opp. Mot. Dismiss Countercls. and Strike
Affirmative Defense, ECF No. 21.  After a hearing on January 20,
2016, this Court denied Bridge's motion to dismiss.  Elec.
Clerk's Notes, ECF No. 26.

On October 7, 2016, Bridge filed a motion for partial
summary judgment, Pl.'s Mot. Partial Summ. J., ECF No. 38, on
both its counts for breach of contract and for violations of
chapter 93A, as well as on Argo's second counterclaim for
violations of chapter 93A, along with a supporting memorandum,
Pl.'s Mem. Supp. Mot. Partial Summ. J. ("Pl.'s Mem."), ECF No.
39, and statement of facts, Statement of Undisputed Facts Supp.
Bridge's Mot. Partial Summ. J. ("Pl.'s Statement Facts"), ECF
No. 40.

That same day, Argo filed a motion for summary judgment on
both Bridge's counts for breach of contract and for violations
of chapter 93A, Def.'s Mot. Summ. J., ECF No. 41, along with a
supporting memorandum, Argo Tea's Mem. Supp. Mot. Summ. J.,
("Def.'s Mem."), ECF No. 42, and statement of facts, Argo's
Statement of Undisputed Facts ("Def.'s Statement Facts"), ECF
No. 43.

[3]

On October 28, 2016, Argo and Bridge each filed a
memorandum in opposition to the other's motion for summary
judgment, Pl.'s Opp. Def.'s Mot. Summ. J. ("Pl.'s Opp. Mem."),
ECF No. 59; Argo's Mem. Opp. Pl.'s Mot. Summ. J. ("Def.'s Opp.
Mem."), ECF No. 55, along with supporting counterstatements of
facts.  Pl.'s Resp. Def.'s Statment Undisputed Material Facts
("Pl.'s Counterstatement Facts"), ECF No. 60; Argo Tea's Resp.
Bridge's Statment Facts Supp. Mot. Partial Summ. J. ("Def.'s
Counterstatement Facts"), ECF No. 56.  On November 7, 2016, Argo
filed a reply to Pl.'s Opp. Mem. Argo's Reply Supp. Mot. Summ.
J. ("Def.'s Reply"), ECF No. 64.

   **B.   Factual Background**

   Bridge is a nonprofit corporation headquartered in
Massachusetts.  Pl.'s Statement Facts ¶ 1; Def.'s
Counterstatement Facts ¶ 1.  Defendant Argo is a Delaware
corporation headquartered in Illinois.  Compl. ¶ 2, Answer ¶ 2;
Pl.'s Statement Facts ¶ 2; Def.'s Counterstatement Facts ¶ 3.
Bridge owns a building at 47 West Street in Boston.  Pl.'s
Statement Facts ¶ 4; Def.'s Counterstatement Facts ¶ 4.  Bridge
leases out part of the ground floor of that building ("the
premises") to commercial tenants to help fund its nonprofit
activities.  Pl.'s Statement Facts ¶ 7; Def.'s Counterstatement
Facts ¶ 7.

[4]

On January 8, 2015, Bridge and Argo entered into a lease agreement, according to which Argo was to operate a retail tea shop on the premises. Pl.'s Statement Facts ¶ 8; Def.'s Counterstatement Facts ¶ 8. The parties dispute much of what happened next.

Under the terms of the Lease, Argo had to make "reasonable efforts" to obtain all required governmental permits to build and operate the shop within 120 days from the signing of the Lease (i.e., May 8, 2015).[1] Compl., Ex. 1 ("Lease") 12, ECF 1-1.

_____

[1] In relevant part, the Lease provides that:
4.5(c) Promptly following Landlord's approval of Tenant's plans and specifications as set forth above, Tenant, at its sole cost and expense, shall apply for, and thereafter use reasonable efforts to obtain, all necessary governmental permits and approvals for Tenant's Work and all other governmental permits and approvals as shall be necessary in order for Tenant to promptly open and operate the Premises for the Permitted Use as required herein (collectively, "Tenant's Permits"). No plans and/or specifications shall be filed or submitted to any governmental authority in connection with Tenant's Permits without Tenant's first having obtained Landlord's approval of same. Landlord agrees to cooperate with and provide reasonable assistance to Tenant in connection with Tenant's pursuit of Tenant's Permits, provided that Landlord shall have no obligation to incur any out-of-pocket cost or expense in connection therewith. Tenant shall keep Landlord reasonably apprised of the progress of Tenant's Permits, including without limitation Tenant's promptly providing Landlord with copies of all applications, submissions and correspondence given or received in connection with Tenant's Permits. The date upon which Tenant's Permits shall have been issued is referred to herein as the "Permits Date." If the Permits Date has not occurred by the Outside Permits Date then either party shall have the right to terminate this Lease without further recourse by notice to the other party, except that Tenant shall not have the right to so terminate this Lease if Tenant is in default

Before applying for the necessary permits, Argo was obligated
under the Lease to submit its renovation plans and other
specifications to Bridge for its approval. Id. at 11. Argo had
sixty days from the signing of the Lease to do so.[2] Id. The
parties dispute when Argo first submitted the initial set of
plans to Bridge and the extent to which the plans were complete.
Def.'s Statement Facts ¶ 10; Pl.'s Counterstatement Facts ¶ 10.

After many rounds of revision, Argo submitted revised plans
to Bridge on April 20, 2015. Pl.'s Statement Facts ¶ 25; Def.'s
Counterstatement Facts ¶ 25. The parties further dispute
whether Bridge gave written approval of the plans on May 7, or
whether, having failed to give written approval, they were

-------

of any of its obligations hereunder (including without
limitation any failure by Tenant to have exercised reasonable
efforts to obtain Tenant's Permits as required herein). As
used herein, the "Outside Permits Date" shall mean 120 days
after the Date of Lease as the same may be extended as set
forth below. If Tenant is unable to obtain Tenant's Permits
by the Outside Permits Date as originally set forth herein
then Tenant may, by notice to Landlord given before such
Outside Permits Date, request that Landlord consent to a one-
time 30-day extension of the Outside Permits Date. So long as
Tenant shall have theretofore been using continuous
reasonable efforts to obtain Tenant's Permits, Landlord shall
not unreasonably withhold, condition or delay such consent.
Compl., Ex. 1 ("Lease") 12, ECF 1-1 (emphasis added).

[2] The specific Lease provision establishes that: "4.5(b)
Tenant shall, within sixty (60) days of the [signing of the Lease],
cause complete plans and specifications showing Tenant's Work to
be prepared . . . . Tenant's plans and specifications shall be
submitted to Landlord for Landlord's prior written approval before
Tenant's Work is commenced." Lease 11 (emphasis added).

[6]

deemed tacitly to have approved only on May 18, 2015 (after Argo's deadline to obtain all necessary permits). Pl.'s Statement Facts ¶¶ 31, 42; Def.'s Counterstatement Facts ¶¶ 31, 42.

On June 10, 2015, Argo wrote Bridge expressing its intent to terminate the Lease and seeking the return of its security deposit. Pl.'s Statement Facts ¶ 45; Def.'s Counterstatement Facts ¶ 45; Decl. Kyle Dorso Supp. Pl.'s Mot. Partial Summ. J. ("Dorso Decl."), Ex. 24, ECF No. 50-24. In that letter, Argo maintained that it was exercising its right to terminate the Lease pursuant to Lease Section 4.5(c) which provides in relevant part that:

> If [Argo has not received the necessary permits by May 8, 2015] then either party shall have the right to terminate this Lease without further recourse by notice to the other party, except that Tenant shall not have the right to so terminate this Lease if Tenant is in default of any of its obligations hereunder.

Lease 12.

Bridge responded on June 16, 2015 by sending a letter to Argo rejecting its purported termination and stating that Argo was in breach of its obligations under Section 4.5(c) of the Lease. Pl.'s Statement Facts ¶ 46; Def.'s Counterstatement Facts ¶ 46; Dorso Decl., Ex. 25, ECF No. 50-25. Bridge further informed Argo that under the terms of the Lease, Argo had 30 days to cure the breach. Id. On July 20, 2015, Bridge sent

Argo a letter claiming that Argo had failed to cure its breach and terminating the Lease. Pl.'s Statement Facts ¶ 47; Def.'s Counterstatement Facts ¶ 47; Dorso Decl., Ex. 26, ECF No. 50-26.

## II.  ANALYSIS

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the moving party demonstrates that there exists no genuine issue of material fact and that it is entitled to judgment as matter of law. See Fed. R. Civ. P. 56(c); Celotex v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). "An issue is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010) (citation omitted). Furthermore, "[a] fact is 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Id. at 5 (citation omitted).

### A.  Breach of Contract

Under Massachusetts law, whether a material breach of contract has occurred is matter of fact.[3] Coviello v. Richardson, 76 Mass. App. Ct. 603, 609 (2010); Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc., 42 Mass. App. Ct. 162, 171

---

[3] The parties do not dispute the interpretation of the terms of the Lease. Pl.'s Mem. 9; Def.'s Opp. Mem. 4, n. 1; Pl.'s Opp. Mem. 2.

(1997).  A material breach occurs when the breach goes to "an essential and inducing feature of the contract." Lease-It v. Massachusetts Port Authority, 33 Mass. App. Ct. 391, 396 (1992) (citing Bucholz v. Green Bros. Co., 272 Mass. 49, 52 (1930)). This case is no exception.

Here, the parties dispute whether Argo made "reasonable efforts" to obtain all required governmental permits to build and operate the shop within 120 days from the signing of the Lease, Pl.'s Mem. 2-5; Def.'s Mem. 4-5, including timely submitting complete renovation plans for Bridge's approval. Pl.'s Mem. 3, 10; Def.'s Mem. 4.  To support its claim, Bridge points to email exchanges between Argo's employees and Argo's architects suggesting that Argo delayed putting together the plans required to obtain the permits until only a few days before the deadline for Bridge's approval.  Pl.'s Mem. 5. Bridge also claims that Argo knowingly submitted an incomplete first set of plans to Bridge while stating that they were complete, or almost so.  Id.

Argo, in turn, argues that it diligently prepared the plans and timely submitted them to Bridge.  Def.'s Mem. 4; Def.'s Statement Facts ¶ 10.  Argo also contends that it did not breach the Lease because its failure to apply for permits was due to Bridge's failure to give timely written approval to Argo's plans, as required under the Lease.  Def.'s Opp. Mem. 4.  The

exact day on which Argo obtained Bridge's (express or implied) approval of its plans is disputed. Argo argues that even were it to concede that Bridge gave written approval to its plans on May 7, 2016, that would not have given Argo feasible time to obtain the necessary permits, given that the deadline under the Lease expired the next day (May 8, 2016). Id. In other words, Argo argues that Bridge's delay in approving its plans created a practical impossibility for Argo to fulfill its obligations under the Lease.

Bridge, in response, argues that Argo failed timely to submit its initial plans to Bridge and, had Argo done so, it would likely have had enough time to apply for permits even on a tight schedule. Pl.'s Opp. Mem. 5. Moreover, as Bridge points out, the Lease allowed for Argo to request a one-time 30-day extension of the deadline to obtain the permits. Id. at 4, n.2; Lease 12. The parties do not dispute that Argo never requested such an extension. Pl.'s Opp. Mem. 4, n.2.

From the record before this Court, there are genuine issues of material fact in dispute regarding Argo's alleged breach of contract. This is an issue properly reserved to the factfinder. Accordingly, summary judgment is denied as to the breach of contract claim.

### B.   Accelerated Rent Provision

The parties also dispute whether the Lease's accelerated rent provision is enforceable under Massachusetts law.[4]  Def.'s Mem. 8-13; Pl.'s Opp. Mem. 9-19.  It is well settled under Massachusetts law that "a contract provision that clearly and reasonably establishes liquidated damages should be enforced, so long as it is not so disproportionate to anticipated damages as to constitute a penalty."  TAL Fin. Corp. v. CSC Consulting, Inc., 446 Mass. 422, 431 (2006); see also Bose Corp. v. Ejaz, 732 F.3d 17, 24 (1st Cir. 2013).  This principle applies to rent acceleration provisions.  Cummings Proprieties, LLC v. National Communications Corp., 449 Mass. 490, 494 (2007) ("[R]ent acceleration clause, in which a defaulting lessee is required to pay the lessor the entire amount of the remaining rent due under the lease, may constitute an enforceable liquidated damages provision so long as it is not a penalty.").

Whether a provision in an agreement is an enforceable liquidation of damages or an unenforceable penalty is matter of law.  Manganaro Drywall, Inc. v. Penn-Simon Constr. Co., 357 Mass. 653, 656 (1970).  Argo bears the burden of demonstrating that the rent acceleration provision is unenforceable, i.e. that

---

[4] The provision allows Bridge to recover as remedy for Argo's breach all "additional rent under this Lease for the remainder of the [Lease]."  Lease 22.

"at the time the contract was made, actual damages were [not] difficult to ascertain and that the sum agreed on by the parties as liquated damages [does not] represent a reasonable forecast of damages expect to occur in the event of a breach." Cummings, 449 Mass. at 494 (emphasis added). See also TAL Fin., 446 Mass. at 427; Honey Dew Assocs., Inc. v. M & K Food corp., 241 F.3d 23, 27 (1st Cir. 2001) ("[T]he prevailing rule is that the party challenging the enforceability of a liquidated damages clause has the burden of proving that it is a penalty.").

Argo, however, offers only conclusory statements and no actual evidence, that at the time it negotiated the Lease with Bridge, the actual damages were not difficult to ascertain. Def.'s Mem. 8-9; Def.'s Statement Facts ¶ 17. Bridge, in turn, denies that this is the case. Pl.'s Opp. Mem. 10-13; Pl.'s Counterstatement Facts ¶ 17. Specifically, Bridge argues that it could not have anticipated at the time the contract was negotiated when in the Lease term a breach would be likely to occur, what the rental market would be at that time, or what would be the cost of finding another tenant and the length of time the property might remain vacant. Id. The Massachusetts Supreme Judicial Court has held that these factors support the conclusion that damages were difficult to ascertain at the time of contracting. Cummings, 449 Mass. at 496; NPS, LLC v. Paul Minihane, 451 Mass. 417, 420-21 (2008).

[12]

Argo's argument that the accelerated rent provision does not represent a reasonable forecast of damages because it would allow Bridge to "double dip" by recovering rent from Argo while simultaneously collecting rent from a replacement tenant, Def.'s Mem. 9-11, finds no support in binding precedent.  Nor does Argo provide at any point an estimate as to what reasonable damages would be in this case.  The First Circuit has held that such failure is sufficient to defeat a claim that a liquidated damages contract provision represents an unreasonable forecast of damages and is grossly disproportionate to the expected damages.  Reed v. Zipcar, Inc., 527 F. App'x. 20, 23-24 (1st Cir. 2013); Bose Corp., 732 F.3d at 25.

Accordingly, this Court holds that the accelerated rent provision in the Lease is enforceable under Massachusetts law. The exact amount of damages to be awarded if Bridge prevails in its breach of contract claim, however, is properly reserved to the factfinder.

### C.   Chapter 93A Violations

Chapter 93A prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," Boyle v. International Truck and Engine Corp., No. 01-10039-DPW, 2002 WL 823810, at *6 (D. Mass. Apr. 23, 2002) (Woodlock, J.), but does not itself provide standards for determining what constitutes an unfair or deceptive act.

[13]

Id.  Under Massachusetts law, courts should consider the following three factors in deciding whether a chapter 93A violation exists: "1) whether the practice falls within the penumbra of common-law, statutory, or other established concepts of unfairness; 2) whether it is immoral, unethical, oppressive, or unscrupulous; and 3) whether it causes substantial injury to consumers, competitors, or other businessmen." Id. (citing PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975)).  All three factors must be met for there to be a finding of unfair or deceptive action.  Id.

Whether a party's conduct amounts to an unfair or deceptive act or practice is matter of fact.  See Spence v. Boston Edison Co., 390 Mass. 604, 616 (1983).  In the typical case, however, "a breach of contract alone does not amount to an unfair act or practice under G.L. c. 93A, § 2." Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995) (citing Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100-01 (1979)).[5]  Here, the underlying facts and allegations supporting

---

[5] A practice may also be considered deceptive for the purposes of a chapter 93A violation "if [it may] reasonably be found to have caused [the plaintiff] to act differently than she otherwise might have [acted]." Pimental v. Wachovia Mortg. Corp., 411 F. Supp. 2d 32, 40 (D. Mass. 2006) (citation omitted); Duclersaint v. Federal Nat. Mortg. Ass'n, 427 Mass. 809, 814 (1998); Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 777 (1980).  Nothing in the record indicates that Argo alleged unfair conduct caused Bridge to act differently than she otherwise might have acted.

both Bridge's and Argo's counts for alleged violation of chapter
93A are the same as those underlying the count for breach of
contract addressed supra.   Under Massachusetts law, breach of
contract does not give rise to a claim for relief under chapter
93A.[6]

Even were this Court to conclude that the counts for
violations of chapter 93A did not arise out of the breach of
contract count, it would still reject both chapter 93A counts on
the ground that any "'unfair practice[]' 'must attain a level of
rascality that would raise an eyebrow of someone inured to the
rough and tumble world of commerce.'" J.E. Pierce Apothecary,
Inc. v. Harvard Pilgrim Health Care, Inc., 365 F. Supp. 2d 119,
143 (D. Mass. 2005) (citing Quaker State Oil Ref. Corp. v.
Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir. 1989)).[7] Here,
neither party has presented evidence that would allow a rational
factfinder to conclude that the other party's conduct was unfair

---

[6] Argo argues that it is not liable for violations of chapter
93A because its conduct occurred outside Massachusetts.  Def.'s
Mem. 7.  Given this Court's decision as to the claims of violations
of chapter 93A, this issue becomes moot.

[7] This is the brilliant, well-known and evocative formulation
of the standard by Justice Rudolph Kass in Levings v. Forbes &
Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979).  It has since
been disavowed by the Massachusetts Supreme Judicial Court as
unhelpful.  Massachusetts Employers Ins. Exchange v. Propac-Mass,
Inc., 420 Mass. 39, 42 (1995).  While of course obedient to the
current formulation, I still cite the Kass standard because, to
me, it is very helpful indeed.

and deceptive to the extent required to constitute a violation of chapter 93A.

Accordingly, summary judgment as to this count is proper.

## III. CONCLUSION

For the foregoing reasons, this Court GRANTS IN PART and DENIES IN PART Bridge's motion for partial summary judgment, ECF No. 38, and GRANTS IN PART and DENIES IN PART Argo's motion for summary judgment, ECF No. 41.  Summary judgment is DENIED as to the claim and counterclaim for breach of contract; it is GRANTED as to the claim and counterclaim for alleged violations of chapter 93A, extinguishing those claims in this action.

**SO ORDERED.**

*William G. Young*
WILLIAM G. YOUNG
DISTRICT JUDGE